**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JACK IN THE BOX INC.,  JACK IN THE BOX EASTERN DIVISION LP, DIFFERENT RULES, LLC,  JACK IN THE BOX PROPERTIES, LLC, *Plaintiffs* | § § § § § § | SA-20-CV-00328-XR |
| -vs- | § § | |
| SAN-TEX RESTAURANTS, INC., ANIL S. YADAV, ATOUR EYVAZIAN, VANDANA YADAV, *Defendants* | § § § § | |

## ORDER

On this day, the Court considered Plaintiff's Motion to Dismiss Defendant San-Tex Restaurants, Inc.'s Counterclaims (ECF Nos. 26, 36), Defendant's Response (ECF No. 37), and Plaintiff's Reply (ECF No. 38). After careful consideration, the Court issues the following order.

## BACKGROUND

This case arises out of the alleged copyright infringement of the Jack in the Box trade name. Plaintiffs assert that on August 23, 2010 Defendants Atour Eyvazian and Anil Yadav entered into Franchise Agreements with Plaintiff Jack in the Box, Inc. ("JITB") for 49 restaurant locations in Texas. ECF No. 15 ¶ 43. On the same day, Mr. Eyvazian and Mr. Yadav assigned the Franchise Agreements to Defendant San-Tex Restaurants, Inc. ("San-Tex"), and San-Tex entered into a separate Lease Agreement with Plaintiff Jack in the Box Eastern Division, L.P. for each of those locations. *Id*. ¶¶ 44, 48. These Lease Agreements permitted San-Tex to use and occupy the restaurants as long as it conformed to the standards of quality established by JITB. *Id*. ¶ 51.

Plaintiffs allege that San-Tex's Restaurants had multiple operational and financial deficiencies. *Id*. ¶ 56. On July 12, 2017, JITB sent San-Tex pre-default notices outlining specific

deficiencies and recommending remedial steps. *Id*. ¶ 57. JITB followed up with additional deficiency notices in 2018 and 2019. *Id*. ¶¶ 58–59. These notices informed San-Tex that its restaurants' deficiencies constituted breaches of the Franchise Agreements. *Id*. ¶ 61. Collectively, the deficiencies noted in San-Tex restaurants included: 1) not having a working HVAC system, 2) major exterior damage, 3) excessive pot holes in the parking lots, 4) insufficient lighting, 5) missing or malfunctioning kitchen equipment, 6) broken walk-in coolers and ice machines, 7) water leakage, 8) insufficient kitchen exhaust, and 9) multiple OSHA violations. *Id*. ¶ 62. Plaintiffs allege that San-Tex had not cured these deficiencies by the time it filed its Amended Complaint. *Id*. ¶¶ 63–65.

In the summer of 2019, JITB sent San-Tex a written Notice of Default of Franchise Agreements for Operational Issues. *Id*. ¶ 66. The Notice of Default formally notified San-Tex of its default of the Franchise Agreements, outlined a history of JITB's efforts to work with San-Tex to remedy the deficiencies, and demanded cure of the deficiencies by August 1, 2019. *Id.* 67–69. On August 8, 2019, after San-Tex's failure to timely cure the deficiencies, JITB issued a written Notice of Termination of Franchise Agreements and Grant of Temporary License advising San-Tex of its failure to timely cure. *Id*. ¶¶ 71–72. Under the Franchise Agreement, San-Tex's right to operate its 49 restaurants terminated at the end of the cure period on August 1, 2019. *Id*. ¶¶ 84–85. However, San-Tex continued to operate its restaurants. Plaintiffs allege that San-Tex has been operating its Jack in the Box restaurants without Franchise Agreements or licenses from JITB since the end of the cure period. *Id*. ¶¶ 86–87. They assert that without these agreements or licenses, San-Tex is no longer permitted to identify itself or its restaurants as Jack in the Box restaurants or use any JITB trademarks or other symbols confusingly similar thereto. *Id*. ¶¶ 92–93.

On June 2, 2020, Plaintiffs filed their Amended Complaint, alleging, *inter alia*, that the Defendants are in breach of their Franchise and Lease Agreements and are infringing upon the Jack in the Box trademark. *Id.* On June 30, 2020, Defendants filed their Answer, and San-Tex separately filed a Counterclaim against JITB and Different Rules, LLC. ECF No. 18. On September 10, 2020, Defendants filed their Amended Answer and Counterclaim. ECF No. 32.[1]

In its Counterclaim, San-Tex asserts that it invested millions of dollars into its San Antonio Jack in the Box restaurants with the promise that JITB would be its partner and was dedicated to ensuring San-Tex's long-term success. *Id.* ¶¶ 11–16. However, San-Tex's investment in the San Antonio market encountered challenges. San-Tex alleges that it frequently met with JITB and shared its concerns and proposed solutions to these challenges, and JITB repeatedly promised that it would address San-Tex's concerns. *Id.* ¶ 32. However, JITB never provided the support San-Tex alleges it was promised. *Id.* ¶ 34. San-Tex further alleges that a food safety inspector working for JITB had sexually harassed multiple San-Tex employees and retaliated when San-Tex raised these concerns with JITB by consistently giving San-Tex restaurants lower food safety scores. *Id.* ¶¶ 35–37.

San-Tex next alleges that JITB forced Mr. Eyvazian out of his position with San-Tex with the promise that JITB would cooperate and approve San-Tex's turnaround plan for the San Antonio market. *Id.* ¶¶ 38–40. In 2018, Mr. Yadav met with JITB's then-CEO Leonard Comma and one Mark Blankenship, who represented to Mr. Yadav that JITB would not terminate the Franchise Agreements if Mr. Yadav replaced Mr. Eyvazian as the operator of the San Antonio market. *Id.* ¶ 42. In reliance on this representation, Mr. Yadav agreed to take over as the operator of the San Antonio market for San-Tex. *Id.* ¶ 43. San-Tex alleges that it invested substantial

---

[1] From this point on, any reference to ECF No. 32 will refer to the Counterclaim portion of this docket entry and not to the Defendants' Answer unless otherwise specified.

moneys and subsidized many underperforming stores in reliance on the promise that JITB would soon permit the closure of those stores. *Id*. ¶ 45. JITB never did so. *Id*. ¶ 47.

Additionally, San-Tex alleges that JITB acted in retaliation against Mr. Yadav when it held San-Tex in default. Specifically, the National Jack in the Box Franchisee Association held a highly publicized vote of no confidence to replace its then-CEO. Mr. Yadav was an outspoken member of this Association's board. *Id*. ¶ 49. In the summer of 2018, Mr. Yadav was among the Association's operators who delivered the vote of no confidence to Mr. Comma, to which the CEO allegedly threatened to "create chaos" and "cut off corporate communication and support to San-Tex." *Id*. ¶ 50.

Overall, San-Tex alleges that Plaintiffs materially breached the Franchise Agreements by imposing unreasonable requirements on San-Tex, manufacturing a pretextual default, terminating the franchise relationship without cause, fraudulently inducing San-Tex to invest in the remodeling and renovation of the restaurants, and harming San-Tex's business. *Id*. ¶ 61. San-Tex separately alleges that JITB breached an agreement to repair and improve the roof designs at certain San-Tex Jack in the Box restaurants. *Id*. ¶¶ 78–80. In its Counterclaim, San-Tex brings causes of action alleging violations of the California Franchise Relations Act ("CFRA"), the California Unfair Practices Act ("CUPA"), breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, negligent and intentional misrepresentation, and civil conspiracy. ECF No. 32.

On August 4, 2020, Plaintiffs moved to dismiss San-Tex's Counterclaims under Federal Rule of Civil Procedure 12(b)(6). On August 27, 2020, this Court held a status conference. At the status conference, San-Tex's counsel acknowledged that it did not plead the intentional misrepresentation and civil conspiracy claims with the specificity required under Rule 9(b). The

Court granted San-Tex leave to file an Amended Counterclaim, and San-Tex did so on September 10, 2020. *See* ECF No. 32. On September 24, 2020, Plaintiffs filed another motion to dismiss San-Tex's re-pled Counterclaims and incorporating its original motion. *See* ECF No. 36. The Court took the parties' arguments under advisement.

## DISCUSSION

### I.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. February 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. LLC v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain recovery") (internal quotation marks and citations omitted).

"Claims alleging fraud and fraudulent inducement are subject to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Schnurr v. Preston*, No. 5:17–CV–512–DAE, 2018 WL 8584292, at *3 (W.D. Tex. May 29, 2018). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. VMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). "Directly put, the who, what, when, and where must be laid out." *Id.* at 178. "Facts and circumstances constituting charged fraud must be specifically demonstrated and cannot be presumed from vague allegations." *Howard v. Sun Oil Co.*, 404 F.2d 596, 601 (5th Cir. 1968). "Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 US at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the court should neither "strain to find inferences favorable to plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

6

## II.     Choice of Law

At the outset, the Court must determine which state's law applies to this case. "[A] federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state, here Texas." *Mayo v. Hartford Life Ins. Co*., 354 F.3d 400, 403 (5th Cir. 2004). "Texas courts use the ALI Restatement's 'most significant relationship test' for all choice of law cases except those contract cases in which the parties have agreed to a valid choice of law clause." *Spence v. Glock, Ges.m.b.H*., 227 F.3d 308, 311 (5th Cir. 2000). "When dealing with narrow choice of law provisions [in contracts], Texas law requires an issue-by-issue choice of law analysis." *Benchmark Elecs., Inc. v. J.M. Huber Corp*., 343 F.3d 719, 727 (5th Cir. 2003), opinion modified on denial of reh'g, 355 F.3d 356 (5th Cir. 2003).

Plaintiffs first assert that California law applies to San-Tex's claims for breach of the Franchise Agreement, breach of the implied duty of good faith and fair dealing, and California statutory violations. ECF No. 26 at 4–5. Section 19(D) of the Franchise Agreement exemplar submitted by JITB states "[t]he laws of California shall apply to any claim or controversy regarding the making, entering into, performance, or interpretation of this Agreement." ECF No. 15 Ex. C. Plaintiffs then assert that Texas law applies to the remainder of San-Tex's claims—namely, the claims for promissory estoppel, misrepresentation, and conspiracy. ECF No. 26 at 5.

San-Tex responds that California law applies to all of its counterclaims. It points out that the Franchise Agreement also states that "[i]f . . . any provision of this Agreement would not be enforceable under the laws of California, Franchisee is located outside of California, and such provisions would be enforceable under the laws of the state in which Franchisee is located, then such provision shall be interpreted and construed under the laws of that state." ECF No. 28 at 4. It

7

argues that the California choice-of-law provision should not be disturbed because Plaintiffs have not identified any genuine conflict between California and Texas law. *Id*.

The Court finds that California law applies to San-Tex's contractual claims arising out of the Franchise Agreement and Texas law applies to its remaining claims. There is no dispute that the Franchise Agreement is a valid and enforceable contract, nor that the choice of law provision is applicable at least to San-Tex's contractual claims. Thus, California law applies to claims "regarding the making, entering into, performance, or interpretation" of the Agreement. It follows that for the choice-of-law provision in the Franchise Agreement to apply to a particular claim, it must actually "regard[] the making, entering into, performance, or interpretation" of the contract. San-Tex's claims for breach of contract and breach of the duty of good faith certainly arise out of the performance of the Franchise Agreement. As discussed below, its statutory claims do as well.

However, the claims for promissory estoppel, misrepresentation, and conspiracy, as well as the claims arising out of the roof repair and remodeling dispute, do not. Thus, the Court must apply the "most significant relationship test." Under this test, the Court weighs (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *See* Restatement (Second) of Conflict of Laws § 145(b). These factors support a finding that Texas law applies to San-Tex's non-contractual claims.

The first factor does not favor the application of either Texas or California law. San-Tex is a Texas entity. Defendant Eyvazian is a Texas citizen. The Yadavs are California citizens. JITB is a Delaware corporation with its principal place of business in California. However, the second, third, and fourth factors support the application of Texas law. The injury undoubtedly "occurred"

in Texas since the injury is the monetary harm to San-Tex's Texas franchises. And much of the conduct that caused the harm occurred in Texas—for example, the alleged pretensive health and safety scores and the JITB food safety inspector's sexual harassment of San-Tex employees occurred in Texas. San-Tex did not plead facts that would lead the Court to conclude that the conduct that caused the alleged injury occurred in California. The most that San-Tex has said is that the fraudulent practices must have occurred in California because that is where JITB's corporate headquarters is located. Although the Court acknowledges there is some sense to this, San-Tex did not plead specific facts asserting that specific acts occurred in California. Finally, the relationship between the parties is centered around the Central Texas fast food market, not California. On balance, Texas has the most substantial relationship to San-Tex's remaining counterclaims, and the Court will apply Texas law to those claims.

## III.   Analysis

### a.  San-Tex's Statutory Claims

Plaintiffs argue that San-Tex's CFRA and CUPA claims must fail because they only apply to franchises located in California. Plaintiffs point out that the jurisdictional provision of the California Business & Professions Code states that all provisions of the CFRA apply only to those franchises that are or were previously located in California, or where the franchisee is domiciled in California. Neither San-Tex nor its franchises satisfy this jurisdictional requirement. ECF No. 26 at 6–7. Plaintiffs argue that San-Tex's CUPA claim fails because it is derivative of its CFRA claim. As with the CFRA, it asserts that the "CUPA was 'neither designed nor intended to regulate claims of non-residents arising from conduct occurring entirely outside of California.'" *Id.* at 7 (quoting *Stocco v. Gemological Inst. Of Am.*, No. 12-CV-1291 WQH, 2013 U.S. Dist. LEXIS 1603, at *30 (S.D. Cal. Jan. 3, 2013)).

San-Tex counters that Plaintiffs construe the term "franchisee" too narrowly. It asserts that because Defendant Anil Yadav has a separate franchisor-franchisee relationship with JITB based on franchises that Mr. Yadav owns in California, the Court should apply the CFRA to this case. It also asserts that the Yadavs were California residents at the time that they executed the original Franchise Agreement with JITB. Although the Franchise Agreements were contemporaneously assigned to San-Tex, Mr. Yadav is an original franchise investor and is currently domiciled in California. ECF No. 28 at 5–6. Indeed, although Defendant Yadav assigned the Franchise Agreement to San-Tex, he retained significant responsibility and liability to JITB. *Id*. at 7 (citing ECF No. 15-5 ¶ 7). For these reasons, and because it alleges that the conduct giving rise to the lawsuit largely originated in California because most of Plaintiffs' principal places of business are in California, San-Tex argues that the CUPA applies. *Id*. at 8.

"The CFRA, at section 20000 *et seq*., serves to protect California franchisees, typically small business owners and entrepreneurs, from abuses by franchisors in connection with the nonrenewal and termination of franchises." *1-800-Got Junk? LLC v. Superior Court*, 189 Cal. App. 4th 500, 515 (2010), as modified (Nov. 19, 2010). Courts must interpret "the CFRA broadly to carry out legislative intent, that intent . . . is to protect franchise investors, *i.e*. those who 'pay for the right to enter into a business.'" *Thueson v. U–Haul Int'l., Inc.*, 144 Cal. App. 4th 664, 673 (2006). A party may not avail itself of the protections of the CFRA merely by contractually agreeing to be bound by California law generally. *Dr Pepper Bottling Co. of Tex. v. Del Monte Corp.*, CIV.A. CA3-88-3012-D, 1990 WL 291495, at *4 (N.D. Tex. Jan. 30, 1990) ("[C]ourts applying the California statute and regulations in situations where the parties have contractually chosen California law have consistently given effect to the residence and place of business limitations of the franchisee protection legislation."). Instead, coverage under the CFRA is limited

to those "franchise[s] where either the franchisee is domiciled in this state or the franchised business is or has been operated in this state." CAL. BUS. & PROF. CODE § 20015.

There is no dispute that none of the San-Tex restaurants at issue have ever operated in California. The CFRA only applies if a franchisee is domiciled in California. San-Tex is the current franchisee, but Defendants Anil and Vandana Yadav were the original franchisees and were domiciled in California at the time of formation of the franchisor-franchisee relationship with JITB. Although a public records search on the Texas Secretary of State's website revealed that Anil Yadav is the CEO, Director, and President of San-Tex, there is no information about whether Mr. Yadav has any ownership interest in the corporation. Nor has San-Tex pled so. The only investment by Mr. Yadav that the Court is aware of is the initial investment when he entered into the Franchise Agreements and contemporaneously assigned the Agreements to San-Tex and a subsequent investment when Mr. Yadav took over for Mr. Eyvazian. Although the CFRA is to be construed broadly of behalf of franchise investors, the Court has not found convincing evidence to demonstrate that Mr. Yadav is currently an investor in San-Tex such that he should be afforded the protections of the CFRA.  In the event that Mr. Yadav is currently an investor with San-Tex, leave of court is granted for San-Tex to file an amended complaint to assert same.  The Court cannot assume that based upon Mr. Yadav's various titles that he is actually an investor, as opposed to an employee of the franchise.

However, there is no similar jurisdictional requirement associated with the CUPA. The CUPA is a provision of the California Unfair Competition Law, which attaches to any conduct occurring in California. "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice . . . ." CAL. BUS. & PROF. CODE § 17200. The California Supreme Court has interpreted this provision to reach non-residents where the

allegedly fraudulent conduct occurs in California. *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1208, 254 P.3d 237, 248 (2011) ("Certainly the UCL reaches any unlawful business act or practice committed in California."). The Court is sympathetic to San-Tex's argument that at least some of the allegedly fraudulent conduct occurred in California because JITB's corporate headquarters is located in that state. Although that argument itself is insufficient to form the basis for applying California law to all of San-Tex's counterclaims, the Court is convinced that this inference, coupled with the choice of law provision in the Franchise Agreement, is enough to afford San-Tex the protections of the CUPA. That is, the choice of law provision implies that the parties contemplated the application of certain California statutory protections that do not contain jurisdictional limitations similar to that in the CFRA. Accordingly, the Court holds that San-Tex's CUPA claim can survive, even where its CFRA claim currently does not.

**b.  San-Tex's Breach of Contract and Implied Covenant of Good Faith Claims arising out of the Franchise Agreements.**

Plaintiffs next argue that San-Tex's implied covenant of good faith counterclaim should be dismissed because it is "a creature of California law" and is redundant of San-Tex's breach of contract claim. ECF No. 26 at 8. Although it asserts that both the breach of contract and implied covenant claims should be dismissed, the focus of Plaintiffs' argument is on the implied covenant and Plaintiffs never argue why the breach of contract claims should be dismissed.

San-Tex responds that its breach of contract and implied covenant claims involve distinct conduct. That is, where the breach of contract claim arises out of the alleged "improper and pretextual termination of the Franchise Agreements . . . the breach of the implied covenant [claim] concerns the actions taken by [Plaintiffs] in bad faith with the intent to deprive [San-Tex of] the benefit of the Franchise Agreement." ECF No. 28 at 9 (citing ECF No. 18 ¶¶ 84, 86–88).

Under California law, the covenant of good faith and fair dealing is an implied-in-law term of all contracts. *Careau & Co. v. Sec. Pac. Bus. Credit, Inc*., 222 Cal. App. 3d 1371, 1393 (Cal. Ct. App. 1990), as modified on denial of reh'g (Oct. 31, 2001). A claim for breach of this covenant is an action sounding in tort that seeks to remedy this implied duty "without regard to the substance of the contractual obligation." *Id*. The breach of this covenant involves more than a violation of a contractual duty—it requires bad faith dealing. *Id*. at 1394. While breach of this covenant will always result in a breach of the contract, a breach of contract will not necessarily result in a breach of this covenant. *Id*. at 1393–94.

> Thus, allegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.
> . . .
> If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

*Id*. at 1395.

"There are three exceptions to this rule: (1) where a breach of a consensual contract claim is not alleged; (2) where the plaintiff is seeking recovery in tort; and (3) where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits." *Celador Intern. Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004) (citing *id*. and *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 353 n. 18 (2000)). The California Supreme Court gave an example of the third exception: where an employer fires an at-will employee, which is not itself a breach of contract, in order to prevent the employee from receiving compensation properly earned under the employment contract. *Guz*, 24 Cal. 4th at 349–50.

The Court finds that San-Tex has sufficiently pled a cause of action for breach of the implied covenant of good faith and fair dealing. San-Tex's claim states, "[Plaintiffs] are breaching the covenant of good faith and fair dealing by inducing San-Tex to invest millions of dollars to renovate and improve its restaurants and refusing to afford San-Tex an opportunity to recoup and earn a reasonable return on its investment." ECF No. 18 ¶ 87. This allegation is backed up by factual allegations of a fraudulent pretext designed to permit Plaintiffs to terminate the Franchise Agreement with cause. In particular, Plaintiffs assert that JITB's then-CEO made threats of retaliatory action in response to Defendant Yadav's involvement in a vote of no confidence.

A "complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain recovery." *Stockstill*, 561 F.3d at 384; *Iqbal*, 556 US at 678. Here, San-Tex has pled sufficient facts to permit the inference that JITB acted in bad faith to frustrate the benefits of the Franchise Agreement. *See Celador Int'l. Ltd.*, 347 F. Supp. 2d at 852. This is more than a mere recitation of the facts underlying a breach of contract. The allegation is not that Plaintiffs negligently failed to adhere to their end of the bargain, but that Plaintiffs acted maliciously to create a pretext to terminate the Franchise Agreement. These allegations are sufficient to overcome a motion to dismiss.

### c.  San-Tex's Promissory Estoppel and Negligent Misrepresentation Claims.

Plaintiffs next argue that any reliance on statements made by Plaintiffs was unreasonable because such statements were superseded by the language of the Franchise Agreement. ECF No. 26 at 10. They assert that reliance on extracontractual promises of continued support are directly contradicted by the existing scope and term provisions. *Id*. at 10–11. Specifically, JITB highlights the provisions stating that it makes "no assurance of the granting of a new license" at the expiration of the license term in 2030 and that the Franchise Agreement may only be modified or amended

in writing. *Id*. at 11 (citing ECF No. 15 Ex. E, Sections 4(B) and 19(H)). As an alternative ground for dismissal, Plaintiffs argue that Texas law only permits promissory estoppel claims in the absence of a valid and enforceable contract, which is present here. *Id*. at 12.

San-Tex responds that Plaintiffs' no-guaranteed-renewal disclaimer argument fails because it is irrelevant to San-Tex's claims. ECF No. 28 at 11. That is, its claims do not concern whether Defendants were promised a new license after expiration. *Id*. Instead, San-Tex's argument is that the Franchise Agreement was improperly terminated prior to its natural expiration date in 2030. San-Tex does not address Plaintiffs' alternative argument.

The Court finds that San-Tex's promissory estoppel and negligent misrepresentation claims are properly pled. First, Plaintiffs' argument that San-Tex's claims are barred by the no-guaranteed-renewal disclaimer is without merit. The cited portion of the Franchise Agreement identifies the expiration date of the Agreement as September 28, 2030, and states that the Franchisee "understand[s] that this Agreement is not renewable and that [JITB] makes no assurance of the granting of a new license at expiration." ECF No. 15 Ex. E, Section 4(B). This provision plainly covers only the renewal of the Agreement after it expires in 2030. On its face it does not disclaim any reliance on a promise not to terminate the Agreement prior to its natural expiration. San-Tex properly pled detrimental reliance on Plaintiffs' representations that it would not terminate the Agreement if San-Tex made substantial investments in its restaurants. ECF No. 32 ¶¶ 90–92, 95.

Plaintiffs' argument that the Court cannot hear San-Tex's promissory estoppel claim likewise misses the mark. It is true that one cannot recover on a promissory estoppel claim when a valid contract covers the subject of the claim. *See Montgomery Indus. Int'l, Inc. v. Thomas Constr. Co., Inc*., 620 F.2d 91, 95 (5th Cir.1980) (citing *Wheeler v. White*, 398 S.W.2d 93, 97

(Tex.1966)). However, this does not mean promissory estoppel claims cannot be brought in conjunction with a breach of contract claim where the basis of the promissory estoppel claim is not covered by an existing contract. *See Superior Laminate & Supply, Inc. v. Formica Corp.*, 93 S.W.3d 445, 449 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ("Promissory estoppel operates to enforce an otherwise unenforceable promise; '[i]t cannot replace an enforceable contract.'"); *Richter, RMS v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex. App.—San Antonio 2002, no pet.) ("Promissory estoppel is not applicable to a promise covered by a valid contract."). If a jury finds that a valid contract exists covering the subject of the promissory estoppel claim, San-Tex will not be permitted to recover for both claims. But that is not a proper question on a motion to dismiss. San-Tex's claim may go forward.

### d. San-Tex's Breach of Contract and Breach of the Implied Covenant of Good Faith claims arising out of the Roof Shoring Program.

Plaintiffs argue that the Remodel Guide and a letter from JITB's then-CEO ("Comma Letter") on which the Roof Shoring program was based cannot be construed as a contract between the parties. ECF No. 26 at 12–13. They assert that the Remodel Guide expressly contemplates a new franchise agreement as a prerequisite to beginning the remodeling process described therein. *Id.* at 13. Further, Defendants had not begun the remodeling process until July 3, 2019 for the J827, J829, and J830 restaurants at issue. Plaintiffs argue that even if the Remodel Guide and Comma Letter could be construed as a contract offer, no contract was formed because San-Tex did not timely comply with the Comma Letter's requirement to complete all roof repairs by July 2019. *Id.* at 14. With no existing contract, Plaintiffs argue there can be no claim for breach of the covenant of good faith under California law. *Id.* at 15.

San-Tex concedes that the Remodel Guide and Comma Letter are insufficient to create a binding agreement. Instead, they argue that "certain terms" were memorialized, which is sufficient to establish a binding agreement. ECF No. 28 at 10. They assert that they relied on these terms, and at Plaintiffs' inducement made significant investment in its restaurants. *Id.*

"To prevail on a breach of contract claim, a plaintiff must show '(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.'" *U.S. Bank Nat'l Ass'n v. Lewis*, No. SA-16-CV-344-XR, 2018 WL 3468380, at *3 (W.D. Tex. July 17, 2018) (quoting *Wells v. Minnesota Life Ins. Co.*, 885 F.3d 885, 889 (5th Cir. 2018)). To succeed on this claim, San-Tex "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P.*, 995 F. Supp. 2d at 602 (N.D. Tex. February 3, 2014).

The Court finds that San-Tex has not adequately pled factual allegations permitting the Court to reasonably infer that a contract exists. "Under Texas law, the following elements are required for the formation of a contract: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Hoyt v. Saxon Mortg. Servs., Inc.*, No. 3:15-CV-3693-G, 2016 WL 3855176, at *5 (N.D. Tex. July 15, 2016) (citing *Tyler v. Citi-Residential Lending Inc.*, 812 F. Supp. 2d 784, 787 (N.D. Tex. 2011)). San-Tex's claim for breach of contract arising out of the Roof Shoring program states merely that it "accepted" a letter sent by JITB's CEO Leonard Comma, creating a binding agreement. ECF No. 32 ¶ 102. That letter, according to San-Tex, laid out "three undisputed guideposts" of the Roof

Shoring and Remodeling programs, and that they accepted Plaintiffs' offer by beginning to remodel their restaurants in accordance with those guideposts. *Id.* ¶¶ 61, 62, 66, 103.

The Court is unconvinced. Even if it construed the Comma Letter as an offer to form a contract, San-Tex did not properly accept it. "Where an offer prescribes the time and manner of acceptance, its terms must be complied with to create a valid contract." *Hoyt*, 2016 WL 3855176, at *5 (citing *Williams v. Bank of Am., N.A.*, No. CIV. A. H-13-648, 2014 WL 3511025, at *7 (S.D. Tex. July 14, 2014), *aff'd*, 602 F. Appx. 187 (5th Cir. 2015)). The Remodel Guide outlines thirteen steps that describe the JITB-managed remodel process. The Guide states that once a franchisee's architect is approved for a permit to remodel a restaurant, JITB's legal team will draft a new Franchise Agreement. ECF No. 26-1 at 8. "Execution of this agreement is required to release your first remodel TI allowance draw (40% of your total TI contribution)." *Id.* The Remodel Guide outlines a franchise operator-managed remodeling plan, but that plan is only applicable to certain specified restaurants, and there is no allegation that it would apply to San-Tex's restaurants. *See id.* at 5.

Further, the Comma Letters state that JITB's expectation was that all restaurant remodels be completed by September 2018 or July 2019, depending on the design of the restaurant. ECF No. 26-2. It appears that Defendants had not even requested the design specifications and necessary remodeling authorization permits for several restaurants until July 3, 2019. *See* ECF No. 26-3. There is no evidence that the remodeling was complete by the end of July 2019. San-Tex's argument that a valid contract was formed must fail because the offer—if it can even be construed as one—specified the time and manner of acceptance and San-Tex failed to meet those conditions. If the Court cannot reasonably infer the existence of a contract on the facts alleged, San-Tex's

claim for breach of contract cannot survive a motion to dismiss under Rule 12(b)(6). *Stockstill*, 561 F.3d at 384; *Iqbal*, 556 U.S. at 678.

> **e.   San-Tex's promissory estoppel claim arising out of the Roof Shoring Program.**

Plaintiffs next argue that San-Tex's promissory estoppel claim must fail because the Remodel Guide and Comma Letter do not constitute a promise on which there could be detrimental reliance. ECF No. 26 at 15–16. They assert that these documents provide no specifics as to the amount of money that would be reimbursed, nor the dates of reimbursement, nor the standards for the specific roof repairs, nor other necessary terms. *Id*. at 16. No reasonable member of a franchise relationship could reasonably change its position in detrimental reliance on such vague statements. *Id*.

San-Tex responds that San-Tex relied on the Comma Letter and Remodel Guide in undertaking a significant investment in its restaurants. ECF No. 28 at 10. It asserts that Plaintiffs were aware of Defendants' reliance and expenditures, and in fact induced Defendants to make those expenditures. *Id*. (citing ECF No. 18 ¶ 49). They do not respond to Plaintiffs' arguments that no reasonable franchisee could reasonably rely on the Comma Letter and Remodel Guide.

"The requisites of a promissory estoppel claim are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, (3) actual, substantial, and reasonable reliance by the promisee to his detriment, and (4) injustice that can be avoided only by enforcement of the promise." *Hoyt*, 2016 WL 3855176, at *6 (citing *Ellen v. F.H. Partners, LLC*, No. 03-09-00310-CV, 2010 WL 4909973, at *4 (Tex. App.—Austin Dec. 1, 2010, no pet.)). San-Tex's counterclaim alleges that Plaintiffs promised to reimburse San-Tex for all costs associated with the Roof Shoring project and partially reimburse remodeling costs. ECF No. 32 ¶ 122. It alleges that Plaintiffs reasonably

should have expected this promise to induce San-Tex to invest moneys into their restaurants, and that San-Tex reasonably relied on that promise in doing so. *Id.* ¶¶ 123–24.

Whether San-Tex's claim survives turns on whether the Comma Letter and Remodel Guide can reasonably be considered a promise. "Under Texas law, the alleged promise sustaining a promissory estoppel claim must not be 'too vague and indefinite.'" *Stolts v. Wells Fargo Bank, NA*, 31 F. Supp. 3d 876, 881 n.4 (S.D. Tex. 2014) (citing *Addicks Servs., Inc. v. GGP–Bridgeland, LP*, 596 F.3d 286, 300 (5th Cir.2010)). "The promise . . . must be more than mere speculation concerning future events, a statement of hope, or an expression of opinion, expectation, or assumption." *Comiskey v. FH Partners*, LLC, 373 S.W.3d 620, 635 (Tex. App. Houston [14th Dist.] 2012, pet. denied). "[T]he asserted "promise" must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action." *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

On the facts alleged, it does not appear that it would be reasonable and justified for San-Tex to believe a promise was made. In essence, San-Tex describes JITB's nationwide roof shoring and remodeling program that was available for all eligible franchisees as long as certain steps were followed. San-Tex did not follow those steps. Likewise, the Comma Letter appears to have been sent not to San-Tex specifically, but to many franchisees. It did not contain a promise of reimbursement if franchisees took it upon themselves to remodel their restaurants outside of the specified channels. After reviewing these documents, the Court does not find that it was reasonable or justifiable to assume that the Comma Letter and Remodel Guide constituted a promise. San-Tex's claim for promissory estoppel must fail.

**f.  San-Tex's Intentional Misrepresentation Claim.**

Plaintiffs argue that San-Tex fails to establish justifiable reliance on any misrepresentation. ECF No. 36 at 3. First, Plaintiffs assert that they could not have induced Defendants Anil Yadav or San-Tex to enter into the Franchise Agreements or invest moneys in their franchises in 2018 because the two had already been parties to the Franchise Agreements since 2010. *Id*. at 4. Plaintiffs then repeat their argument that any promise to renew the Franchise Agreements is superseded by Section 4(B), which disclaims any promise of post-expiration renewal. Further, Plaintiffs argue that it was not reasonable or justifiable for San-Tex to rely on any representations that contradicted the Franchise Agreement because Section 19(H) of the agreement requires that any modifications or amendments be in writing and signed by all parties. *Id*. at 6. Finally, Plaintiffs assert that San-Tex's intentional misrepresentation claim does not satisfy the heightened pleading standard of Rule 9(b). *Id*. at 7.

San-Tex responds that Section 4(B) is irrelevant to their argument because it is limited to assurances regarding the "granting of a new license at expiration." ECF No. 37 at 3. Next, San-Tex argues that its intentional misrepresentation claim is sufficiently particular under Rule 9(b) because its Amended Counterclaim highlights facts apprising the Plaintiffs of the alleged fraud. They describe representations made by JITB employees in January 2018 indicating that JITB would not hold San-Tex in default if Mr. Yadav replaced Mr. Eyvazian as San-Tex's operator in the San Antonio market. *Id*. at 4–5. They further allege that in reliance on those representations, Mr. Yadav agreed to take over San Antonio operations for San-Tex and invest additional resources into the business. *Id*. (citing ECF No. 32 ¶¶ 41–46).

At the outset, the Court notes that it finds Plaintiffs' argument regarding Section 4(B) of the Franchise Agreements unconvincing for the reasons outlined above. The Court also notes that Plaintiffs do not identify any other provisions of the Franchise Agreements that contradict the

alleged misrepresentation underlying San-Tex's claim. That is, where San-Tex asserts that Plaintiffs represented that they would not terminate the Franchise Agreements for cause if certain conditions were met, Plaintiffs point to no other provision of the Franchise Agreements that relate to this type of promise. Stated differently, Section 4(B) does not apply because San-Tex does not allege a promise to renew after the natural expiration of the Agreement, and Section 19(H) does not on its face preclude a promise to *continue* the Agreement—which would not involve an amendment or modification requiring a signed writing. So, a general statement that the Franchise Agreement contradicts any oral representations falls flat unless there is an identifiable provision that relates to the subject matter of the alleged misrepresentation.

The Court finds that the intentional misrepresentation claim has been pled with sufficient particularity to satisfy Rule 9(b). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 112 F.3d at 177. San-Tex has identified the statements contended to be fraudulent as the promise not to terminate the Franchise Agreements if San-Tex and Mr. Yadav made certain investments of time and resources. *See* ECF No. 32 ¶¶ 41–42, 110. It has identified the speakers as Mr. Blankenship and Mr. Comma, executives who ostensibly speak on behalf of JITB. *See id*. It has described when and where the statements were made—in January through March of 2018 during meetings between Mr. Comma, Mr. Blankenship, and Mr. Yadav. *See id*. ¶¶ 41–44. And it has explained why the statements were fraudulent. *See id*. ¶ 47 ("[JITB would not permit the closure of underperforming stores] because they wanted to protect the revenue stream from the royalties and other fees that San-Tex was required to pay."); *see also id*. ¶ 111. Accepting these factual

allegations as true, as the Court must, the Court finds that San-Tex's claim for intentional misrepresentation satisfies the heightened pleading standards of Rule 9(b).

### g.   San-Tex's Civil Conspiracy Claims.

Plaintiffs next argue that San-Tex's claim of civil conspiracy must be dismissed because a civil conspiracy cannot exist between a corporation and its employees. ECF No. 36 at 8 (citing *Fojtik v. First Nat'l Bank of Beeville*, 752 S.W.2d 669, 673 (Tex. App.—Corpus Christi 1988, writ denied). Further, they assert that a parent corporation cannot conspire with its wholly owned subsidiary. *Id.* (citing *Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 420 (Tex. App.— Houston [14th Dist.] 1991, writ denied). Thus, they argue that San-Tex's allegations that JITB conspired with companies having common ownership with itself and its employees are insufficient to support a claim for civil conspiracy. *Id.* Additionally, they assert that San-Tex has not satisfied Rule 9(b)'s particularity requirements because San-Tex merely asserts that the alleged conspirators engaged in "overt acts in furtherance of the conspiracy" without providing additional facts about those "acts." *Id.* at 9 (citing ECF No. 32 ¶ 127). Likewise, they argue that San-Tex did not properly plead proof of intent. *Id.*

San-Tex responds that corporate affiliates can be held liable on a theory of corporate conspiracy where there is no "complete unity of interest." ECF No. 37 at 7 (citing *United States ex. rel. Grubea v. Rosicki, Rosicki & Associates, P.C.*, 318 F. Supp. 3d 680, 705 (S.D. N.Y. 2018)). It asserts that the Amended Complaint suggests that the Plaintiffs are distinct entities formed to carry out separate functions within the JITB system. *Id.* at 8. San-Tex also asserts that it properly alleged intent and overt acts under Rule 9(b). *Id.* at 6–7 (citing ECF No. 32 ¶¶ 50–53, 64).

"The elements of a civil conspiracy claim are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more

unlawful, overt acts, and (5) damages as the proximate result." *Crouch v. Trinque*, 262 S.W.3d 417, 426 (Tex. App.—Eastland 2008, no pet.) (citing *Massey v. Armco Steel Co*., 652 S.W.2d 932, 934 (Tex.1983)). It is well established that a corporation cannot conspire with its employees acting within the scope of their employment. *See id.* at 427. Additionally, "as a matter of law, a parent corporation cannot conspire with its fully owned subsidiary." *Atl. Richfield Co.*, 820 S.W.2d at 420 (citing *Copperweld Corp. v. Indep. Tube Co.*, 467 U.S. 752, 777 (1984)).

San-Tex filed its Counterclaim against Plaintiffs JITB and Different Rules, LLC. In its supplemental brief, Plaintiffs attached the declaration of Michael J. Snider, Vice President and Assistant General Counsel of JITB. Mr. Snider attested that Different Rules, LLC is a subsidiary of JITB. ECF No. 36 Ex. B ¶ 4. He does not attest that Different Rules, LLC is a "wholly-owned" subsidiary, a point that San-Tex appears to dispute. This creates a fact issue as to the true ownership of Different Rules, LLC, which the Court cannot resolve on a motion to dismiss. Thus, the Court moves on to determine whether San-Tex has properly pled a claim for civil conspiracy.

The Court need not address Plaintiffs' overt acts argument because San-Tex has failed to establish a meeting of the minds. San-Tex cites to its allegation of a concerted effort by Mr. Comma, JITB's CEO, to punish Defendant Yadav for delivering the vote of no confidence. That description includes allegations of actions taken by Mr. Comma, as well as Mr. Blankenship and Kevin Briscoe, whose job titles are not stated but who appear to be JITB employees. It alleges no direct or indirect facts that Different Rules, LLC, which must be a separate entity if its claim is to survive, understood JITB's intent or intended itself to engage in an unlawful conspiracy with JITB. Mere allegations that "defendants collaborated" and carried out certain tortious acts will not suffice. *See e.g.,* ECF No. 32 ¶¶ 126–27.

"If a plaintiff cannot adequately allege with particularity . . . an element of the underlying fraud, the conspiracy claim also fails." *In re Enron Corp.*, 540 F. Supp. 2d 759, 774 (S.D. Tex. 2007). Because San-Tex has not adequately pled that JITB and Different Rules, LLC had a meeting of the minds in furtherance of a conspiracy, its claim for civil conspiracy must fail.

### h. San-Tex's Second Affirmative Defense.

Plaintiffs final argument is that San-Tex's second affirmative defense, asserting the statute of limitations, should be dismissed under Rule 12(f). Plaintiffs argue that this affirmative defense amounts to a generic recitation that is insufficient to give notice as to which claims it applies to. ECF No. 26 at 19. San-Tex respond that it is clear that this affirmative defense applies to damages that Plaintiffs seek beyond the two-year statute of limitations for claims asserted under the Lanham Act. ECF No. 28 at 14.

Courts within this District tend to apply the "fair notice" pleading standard to affirmative defenses, which is less stringent than the "plausible pleading standard under *Twombly* and *Iqbal*." *Hill Country Bakery, LLC v. Honest Kitchens Grp., LLC*, No. 5:17-CV-334-DAE, 2017 WL 9362706, at *5 (W.D. Tex. Dec. 11, 2017). "Although motions to strike a defense are generally disfavored, a Rule 12(f) motion to dismiss a defense is proper when the defense is insufficient as a matter of law." *Kaiser Aluminum v. Chem. Sales, Inc*., 677 F.2d 1045, 1057 (5th Cir. 1982). Plaintiffs do not argue that the statute of limitations defense is insufficient as a matter of law. Although affirmative defenses generally require some factual pleading, "in some cases, merely pleading the name of the affirmative defense . . . may be sufficient." *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999). Given San-Tex's general denial of each of Plaintiffs' claims, it is clear that San-Tex intends to assert the defense to any claim to which it applies. This is not a defense, such as accord and satisfaction or waiver, where more particular factual pleading is

necessary to provide fair notice. Instead, San-Tex has put Plaintiffs on notice that where Plaintiffs seek damages for conduct falling outside of the applicable statute of limitations, San-Tex will assert the statute in response. Accordingly, Plaintiffs' motion to strike is denied.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to dismiss San-Tex's counterclaims (ECF Nos. 26, 36). San-Tex's breach of contract, breach of the implied covenant of good faith, and promissory estoppel claims arising out of the Roof Shoring Program, as well as its claims for civil conspiracy and violation of the CFRA, are **DISMISSED**. Plaintiffs' motion to strike San-Tex's second affirmative defense is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 14th day of January, 2021.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE